LLC at all. Argument to exceed 15 minutes per side. Mr. Cole for the appellant. May it please the Court, my name is Doug Cole on behalf of Quest Media Group LLC. With the  Court's permission, I'd like to reserve three minutes for rebuttal. May it please proceed. Your Honors, this is a breach of contract action and Quest is here this morning urging this Court to enforce the plain language of its agreement, its contract with Lakes Entertainment. The contract itself is a fee agreement which provides a fee to Quest based on amounts that Lakes Entertainment receives from Penn National Gaming or Rock Gaming, the two operators of Ohio's four casinos. The parties are largely in agreement on both the law and the facts. The parties agree that Lakes received $25 million from Penn in July of 2010 and agree that the $25 million is subject to the fee agreement. The parties agree that under the formula for the fee in Section 1.1A of the agreement, that payment triggered a fee of approximately $3.015 million. The only question here then, as Lakes concedes, is whether another provision, referred to variously as the cap or the annual payment cap, somehow changes that fee. Of course, this Court reviews the meaning of that provision de novo. The cap does not change the fee here for two reasons. First, even assuming that the cap provision applies, it does not change the amount of the fee. It merely changes the time period over which the fee is paid. Second, on the facts here, the cap does not apply at all. It applies only when there are unpaid prior costs, which is a contractually defined term. Here, when Lakes received the $25 million payment, it had been fully repaid for all prior costs, capital P, prior capital C costs as defined in the agreement and thus the cap did not apply at all. The contract itself is in Document 11 in the two key pages. Really, this whole dispute comes down to two key pages in the contract that I would refer the Court to. It's Document 11, Page ID 49, and Page ID 50. Section 1.1a is on Page ID 49, and it sets forth the amount of the fee, which is 18.5% of a defined term called gross distributions. There's another defined term, additional capital required return, that both parties agree the Court can ignore. It does not come into play. Gross distributions is defined as the amount Lakes receives less prior costs, which is again, capital P, prior capital C costs, a defined term in the agreement, and it is also defined on Page ID 49. That's the key definition here. Prior costs means an amount equal to, as of the date Lakes receives its first distribution from, paraphrasing Rocker Penn, the sum of the JV loans and the 2009 initiative costs plus interest multiplied by 20%. In other words, prior costs is defined as a 20% tranche of what you can think of as all of the incurred costs. It just seems to me, in looking to this contract, that nobody thought about the possibility of a lump sum payment. Your Honor, certainly my clients didn't. My clients have been told, and this is a claim that's been settled, and I'm not trying to reinvigorate the claim here, but my clients have been told that this was going to be a long-term participation in all four casinos, and that Lakes was going to... That was the expectation. That was the expectation, and I think the question that then arises is, who bears the risk of the language? That is the question. Right, who bears the risk? Why doesn't your client bear the risk? Well, my client doesn't bear the risk, Your Honor, because my client didn't create the situation. My client wanted the investment in all four casinos to occur, expected the investment in all four casinos to occur. Isn't the question, the person who wants the language to say this is the person who has to show that it does? That's what I'm struggling with. I don't think so, Your Honor. I think that the plain language should be applied as the plain language, and if somebody says, well, wait, the plain language is leading to a difficult result here, now we start asking, well, whose fault is it that the situation is not one that the parties contemplated? But look at the plain language. My clients just want the plain language enforced as written. That's all they're asking for, and if Lakes... Let me ask you, it seems to me under your analysis of the 20% tranche as being the one that does suggest that all prior costs and prior costs mean the same thing, but the thing that concerns me is I'm thinking about what if you had had this $25 million paid over five years, and you've got $5 million paid each year? Under your tranche arguments, would your client have it would depend on whether... On the facts that they turned out, no, they would not have. It would depend on... They wouldn't have. Right, that's right, Your Honor. So you're saying that we've got to look at this language, and all we can do is look in the particular happenstance, because if you had been paid... If they had been paid over five years the $5 million every year, you would be arguing a completely different argument, would you not? We would not, Your Honor. Otherwise, you wouldn't be getting anything. Well, we would be arguing that's the way the contract works. Everybody understood that the timing of the payments, the timing of when lakes received money was going to affect the flow-through. Everybody got that. The reason this amortization provision was in here at all was to try and give my clients... My clients wanted some ability to get some flow-through before the incurred costs had all been paid, and so this notion of a tranched five-year amortization came up. That fact that lakes, though, wanted the prior costs paid before there was flow-through, that whole provision was put in by lakes. That was for lakes' benefit that they were going to be able to recover these prior costs. Absolutely, and so it wasn't us that drafted that language. It wasn't us that changed the factual situation to which the language applies. We were just, in a sense, innocent third-party bystanders here watching as, at every turn, this deal got skinnier and skinnier for us, frankly, as a result of decisions that lakes was making without even including us or letting us know, even though it really impacted the return that we might expect to receive under the contract. So all this is going on without any notice to us, and now lakes wants to come in and they want to change the definition of prior costs because... Do you not see a distinction between prior costs and all prior costs? All prior costs means the entirety of prior costs. Now I do see a difference between all small p prior, small c costs, or all incurred costs, but the way prior costs is defined in this contract, if you define it the way the contract, the way the parties themselves did, all prior costs and prior costs mean exactly the same thing. Nowhere is the capital P prior, capital C costs ever defined or in the suggestion that it's the sum of all of these things. That comes from lakes briefing, and right on page one of their briefing... Let me stop you. Sure, go ahead. I'm trying to get both of you to take a breath here. Sorry, your honor. I don't understand why that's so obvious. It seems to me when, as you describe it, capital P, capital S is used. It's in connection with determining what essentially is the 20% of the investment made in these prior initiative drops. I don't understand why it's so clear in your mind that if someone says all prior costs, that means the same thing as 20%. In other words, if you say prior costs means 20%, all prior costs means all of those 20% collectively together. That just seems to me pretty clear, so tell me why that's wrong. It's wrong, your honor, because the contract is very expressed that it says, as of the first distribution date, and everybody agrees that's the key time here. If we look at 1.1b3, defining prior costs, it says, as of the first distribution date, prior costs shall mean, and then lays out that tranche thing. The other tranches aren't even due, so when you're talking about all prior costs, you'd have to be looking forward in time to additional tranches that haven't even become due yet under the agreement to say that all prior costs somehow means that, and there's no suggestion anywhere. They don't define what's due on the first day as a tranche of prior costs. That's the way Lakes writes it in their brief. They say, well yeah, prior costs meant everything put together. No it didn't. You could have written the agreement that way. You didn't. You wrote prior costs to mean a single tranche as of the first distribution date, and it's very specific with respect to that. So the real question here is, is Lakes going to be allowed to walk away from the definition that it crafted in this agreement because it doesn't like the way it played out on a set of facts that it created? I know you're passionate about this, but don't forget, arguably your client also failed to take into account that there could be one distribution, and didn't put anything into account for that. So it's easy to say, enforce everything against one side. It's sort of back to your risk-bearing discussion that you had with Judge Stranch. It just seems like it's not nearly as clear as you'd like to make it. Well, but your honor, even if we accepted that all prior costs somehow meant what Lakes is saying, there's still the separate problem that this provision doesn't change the fee. It just changes the way in which Quest receives the fee. So all it does is says... I understand that argument, and I understand that that's probably based on the cap language about only getting $500,000 annually, which would indicate that there's more than one. Is there any other provision of the contract that you think evidences the ability to spread out that payment over the years? Well, the annually language is what we find in the contract that's inconsistent with that. I would point to 1.1a, which defines the fee itself, and then the cap, as your honor points out, says notwithstanding anything here unto the contrary, Quest shall receive no more than $500,000 annually until Lakes has been fully repaid for all prior costs. This isn't in the definition of the fee itself, which is in 1.1a. This is a little sub-part of 1.1b.3, the definition of notwithstanding anything here unto the contrary, the fee shall be... it says notwithstanding anything here unto the contrary, Quest shall receive no more than $500,000 annually. If the amount of the fee is greater than $500,000, we agree, and we're not trying to say that the fee somehow trumps this language. They work together. There's a definition for the fee that sets the fee at $3.015 million on the fax here, and then there's a provision that says how that will be received by Quest at $500,000 annually. In that way, we're giving full breadth to both of these provisions. They both have the meaning that's the plain language under the contract, and I guess I still struggle with why, and it's clear throughout Lake's briefing that they're changing that definition of prior costs. We're merely asking for the contract to be enforced as written. All right. Thank you. Judge Dottry, did you have any questions? No. Thank you. Good morning, Your Honors. Skip DeRocher on behalf of Lakes Ohio Development and Lakes Entertainment. I'll refer to both as Lakes for purposes of the argument today. Your Honor, Judge Stranch started out talking about risk, and one thing that I think underlies this whole simple contract dispute is who did have a risk here? Lakes undisputably had $30 million, $27.75 I think million that it invested in the 2008 initiative and another almost $4 million in the 2009 initiative. So when you talk about risk and who was trying to protect what risk, the risk that was being attempted to be protected in this Lake's significant $30 million plus investment compared to Quest's $0 investment in the 2008-2009. But you entered an agreement for the purpose of protecting both sides because Quest has, shall we say, peopled the fight. And, you know, I get the idea that it's not, that they're not the provider of the funding but for an organization to give itself and its workers to a cause, obviously you thought that mattered because you crafted an agreement that attempted to protect both sides. Sure, that's exactly correct. But the overriding purpose of this agreement demonstrated both in the agreement itself and if the Court were ever to get to the extrinsic evidence, that as well demonstrates that the parties both agreed that the prior costs, all the costs, the $30 million plus the tax, the interest, the gross up, all of that was intended to be repaid before Quest was going to receive any significant fee. Is there anywhere else in the agreement where receive, the word receive is used to reflect entitlement as opposed to actual receipt of the money? I believe so, Your Honor, and if you turn to the page 3 of the agreement, it's section 1.1BV which talks about interest. There it's talking about Lakes obtaining additional amounts. It says interest means simple interest accruing at a rate of 10% per annum from the date of any advance plus an additional amount as may be necessary to ensure that the company receives a net amount with respect to JV loans and the 2009 initiative costs equal to the full amount the company would have received had such payments not been subject to taxes. How does that reflect entitlement as opposed to actual receipt? I think it also is talking about a legal entitlement here. The fact that the company would have received such payments had it not been subject to taxes is talking not just about actual receipt but legal entitlement to that money. And that's where Judge Economist correctly looked at the meaning of receive and the meaning of earn being synonymous. And so that plus again if Your Honor were to turn to the extrinsic evidence discussed at the end of our brief, even I believe Mr. Pressman in contemporaneous emails was using the term received in the same manner that we're talking about here. How do you explain the cap language that you'll receive no more than $500,000 annually? And doesn't that indicate that there's an expectation across time? No, I don't think it does at all. Why would it ever say annually if it didn't mean on a yearly basis? If it meant you only get what is that first time frame, that's all you get, why would it say receive no more than $500,000 annually? Because in the event that there were more than one distribution, either one distribution a year or several a year, you still have to look in each year where there's a distribution. This happened to be one distribution one year. You still have to look each year where there is a distribution to determine whether that amount, once you take into account the distribution, whether that exceeds the 20% prior cost. So for each year and this year, and again I think what your honors have to do is look at these particular facts applied to this agreement. We just happen to have one distribution. Did we contemplate, did the parties contemplate 1, 0, 10, 100? We don't know because the agreement doesn't say. The agreement just says if there's... Wasn't there an expectation that it would be over time? It just seems to me, Counselor, that the language indicates that expectation. Well I certainly think that that's one possibility is that there would have been more than one distribution over the course of time. Certainly that possibility, there's also a possibility there never would have been any distribution. This is gambling. This is casinos and so no one knew how this was going to play out. Did anybody anticipate... Was the expectation in crafting this language not that there would be some participation over time? I'm struggling with how that could be otherwise because it seems to me that nobody thought this. It seems to me that the language just does not evidence a consideration that somebody might be bought out early as opposed to paid overtime. I don't think that the agreement reflects one way or the other on that, but I do think that when you talk about what Mr. Cole and others have said, they accept this notion of earn versus receive and that there can be installments over time. I would ask the court to look very carefully at any possible language where that is discussed in this agreement. What the agreement does say, it says that a distribution, the fee shall be paid within five days of the distribution. But also what it says is the amount of the fee is equal to 18% of the gross distribution after payment of additional capital, which you say doesn't matter. So the bottom line is, it says they're going to get 18%, correct? It says they're going to get 18, I think ultimately 18.5% times the, you've got to look at the distribution and the prior costs. And you have the cap, which says notwithstanding... You're looking at 1.1a that sets the amount under that clear language, the amount is $3 million, isn't it? Subject to the cap. The cap starts out, the very next paragraph says, notwithstanding any of the foregoing, notwithstanding any of the foregoing, the most they receive, the most they can receive is $500,000 and as long as the prior costs are not totally repaid. And you see that in various parts of this agreement where the notion is that the prior costs are going to have to be totally repaid before Quest is going to enjoy any sort of significant income. Because after all, remember here... So by accelerating the payment with a buyout, you can defeat the definition of what is the amount earned? Well, as Your Honor pointed out, if this would have been $5 million per year for five years, Quest would have got zero instead of $500,000. If this would have been a... That's the problem for me. Mr. Drescher, could I ask you a question, please? You may. I want to ask the reverse of the question Judge Stranch asked about take that $25 million and pay it over five years. What would have happened had there been multiple distributions in one year as opposed to one distribution or distributions over five years? I think the same result. I think you'd have to still determine in the budget per distributions. You'd look at the distributions and if they added up to exceed 20% of total costs for that one year, then you could... Let's come up with an example. The 20% of prior costs is, I think it was $8.something million. Let's just call it $10 million to make it easy. So let's assume that there were two or three $12 million distributions within one calendar year. What would happen? I believe you'd have to take... At the end of that year, at the end of those distributions, you'd have to determine whether the various distributions exceed the 20% prior costs. If they do... The first of that $12 million distribution in my example, you do your calculations. It would produce... It's more than what the prior cost was for that particular distribution. You would be entitled to a fee, but it would be capped at the $500,000, right? Yes. You would then in that year get... You wouldn't receive anything for the second distribution or the third distribution. That's correct. So then under the claim by Mr. Cole, you would then have a carryover of amounts attributable to multiple distributions in one calendar year. Under Quest's theory, I think that's right. Again, with no provisions in the agreement for how such installment payments would be made, how interest would be paid, where the money would be held. The same problem you'd have if there were multiple distributions. Your argument about, gee, we didn't talk about interest and we didn't talk about who's going to hold the money, that doesn't mean it isn't owed. It just means it's not provided in the agreement. Well, what it means is... It's simply an account receivable and an account payable at that point. But if the court is trying to determine the intent of the parties, the court needs to be looking at the entire agreement. If Quest's argument, from what I understand, is one of two things. Either the cap doesn't apply at all because prior cost just means 20%, and so therefore, never mind that the intent of the parties behind the contract is that Lakes would recover all of its prior costs. So that's its first argument, is pay no attention to the all in the cap, and we just get our full $3 million. The alternative argument is this notion of installment payments. And that's where I think the court does have to look at the entirety of the agreement. Did the parties intend installment contracts? Did the parties intend that receive meant something different than earned so that Quest can just add up the amounts that are going to be owed over the course of a number of years, even though... I'm sorry. You've got to ask yourself the same question. Did the contract intend to allow your client to receive more than the investment, the $30 million or whatever that was invested, and continue to retain that in the face of an 18% promise to Quest? Well, there's nothing in the contract that prohibits that. But there is. I mean, there's nothing in the contract. The contract says we make one payment within five days. That's what it says. After the fee is calculated, you make your... For the annual cap? For the annual cap, you make one payment within five days. No, no. For the fee itself. It doesn't say it in connection with the cap. It says it right. It says the fee is paid within five days of a distribution. So if the fee is supposed to be, as Mr. Cole and Quest are arguing, paid over five or six years, we would be violating the contract by not paying that fee within five days as required by the contract. That's the only term in the contract. Except as provided otherwise means the other provision overrides that five-day period. So there are good arguments on both sides of this. Did this case get mediated through the courts? Just through the Sixth Circuit? Through our mediation program? Through your mediation program, correct. You can see that we're struggling with how to figure this out. From your client's perspective, does it make sense to try that again or not? I don't know that it does, Your Honor. The mediation went nowhere the first time. The parties were quiet. I don't want to get into settlement discussions. That's because you both are so dogmatically hanging to your views that you can't imagine the other side could win. Well, the other side could win. We understand. I'm saying that to both of you. So you've got $500,000 on the one hand. You've got $3 million on the other hand. Seems to me there's a lot of room there in between. Right. Although the $500,000, of course, has already been paid. So it's now looking at something over the top of the $500,000. I wonder if I could ask a question, just mainly out of curiosity. The buyout was only as to the Penn Casinos. Is that correct? That is correct. Is this contract still operational as to the Rock Casinos? Your Honor, as of the record date, yes. Since that time, there has also been a buyout of the Rock Casino. Okay. Thank you. Is there a dispute attendant to the buyout of the other casino? I don't know your answer. There's been no dispute, no lawsuit filed, anything like that. I think what the court does here may impact what happens with the Rock buyout. I don't know. Well, again, because the record is not complete with respect to the Rock buyout, and it occurred afterwards, it was a very small amount of a buyout. So I don't know that ultimately that would make a meaningful difference. So I don't know that that would matter. So the position being that you were never repaid your investment? Right. Again, getting outside the record, even with the Rock buyout, Lakes will not have recovered even its $30 million, much less the $43.5 million with the gross up and the interest. So your actual settlement that brought us down to this one issue only, that was a private settlement, not through the Sixth Circuit? That's correct, Your Honor. So the only thing that's been presented to the mediation office here is this very issue? Yes, it was only after we had reached agreement on other claims, and this appeal was perfected and it was at that point that we mediated with the Sixth Circuit. So you can litigate for years in the future, or you can all sit down and put this thing to bed, right? I suppose that's one way to look at it, although I do, as I said, Your Honor, I think that because the payment was so small that I don't think that on the Rock side, I don't think that there would be litigation for years in the future on that issue. But we do. Thank you. Judge Autry, did you have any further questions? I do not, thank you. Thank you. Just a few very brief points, Your Honors. First, in response to Judge Strancher's question, we've outlined in our reply brief every time receive is used, and I think, as you pointed out, even the example that Mr. DeRocher gave today, receive is really used as take possession of. Every time it's used in the contract, we point it out in our reply brief, it means... Your Honor, I have desperately tried to resolve this case for the last two years, yes. I don't want to get into... I do not want to get into the settlement negotiations either. Your Honor, from a couple of other quick points. First, just in looking at the economics, since we're talking about the economics of the larger deal here, I do want to keep in the Court's mind that the amendment to this agreement, which took it from 18 to 18.5%, so in April of 2010, about three months before Lakes, without any warning, sold its investment in two Penn casinos, it took $500,000 from Quest to take Quest from 18 to 18.5%. Under Lakes... If ROC had been successful, it would have upped your fees in the ROC deal, correct? That's true, but under Lakes' view of the cap, taking that $500,000 to take Quest from 18 to 18.5% had absolutely no benefit for Quest vis-a-vis the ROC, or vis-a-vis the Penn deal. In other words, because they're seeing it as a fee cap of $500,000, 18% or 18.5%, whatever, it's all above the cap, it's all going to get clipped right at the cap amount. So really, all that Quest got back was a return of the $500,000 it had invested with Lakes two months or two and a half months before this transaction took place. We do want the Court to look at the entirety. I was a little surprised Mr. Droscher said look at the entirety. We want the Court to look at the entirety of the agreement. We want the Court to give the defined terms the meaning that the parties assigned to them in the contract that they signed. That's all that Quest is asking is to have this agreement interpreted according to its plain meaning with the definitions that the parties used. The 2008 initiative costs, and I think this bears understanding too, I don't know if it came through in the briefing, the 2008 initiative was an entirely separate transaction. It didn't involve Penn or ROC, it was between a predecessor to Quest called MyOhioNow and Lakes. At the time they originally were talking about the deal, there wasn't even going to be reimbursement for those amounts. That's one of the ways in which, as I said, this deal kept getting skinnier over time. All of a sudden there was a repayment obligation. If you look at Mr. Berman's deposition transcript, he admits that, which I think was filed in connection with the summary judgment briefing, he admits that MyOhioNow had no obligation. In fact I think if you look at the joint venture agreement for MyOhioNow which I know is part of the record here, there was no obligation to repay that amount. It's all kind of been added on as an obligation for my clients. I think our fundamental point, if I can just wrap up, Your Honor, is that, from my perspective, our entire legal system is premised on this notion that words mean something. I don't think it's alright for parties to say, oh, the way this is playing out, we don't like what these words mean. That's what Lakes is trying to do here. They're trying to change the definition of prior costs. All we want is this agreement enforced according to its plain language. Just don't forget, Mr. Cole, when you're negotiating further, if there is negotiations, that it's also a fundamental part of our legal system that courts don't rewrite contracts either. So you both have your positions. We understand that. The case will be submitted. Here's what I would like you to do on behalf of the panel. I want the two of you to talk on your way out the door towards the elevator. I understand that you want to mediate, so you're not the issue here. Mr. Droscher, you're not sure that your client will be willing to try it again. After you two talk, I want you to call your client at some point, and I want the two of you to notify us by Friday of this week as to whether you think that it's worth the effort to have our mediator contact you for a second pass at this in light of what has transpired here this morning. Understood? Excellent. Thank you. Judge Daughtry, I didn't mean to cut you off. Do you have anything further? I do not. Thank you. All right. That will complete this case and complete the arguments for this morning.